**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____
                                              :
AMY KRAUS,                                    :      CIVIL ACTION
                                              :
              Plaintiff,                      :
                                              :
       v.                                     :      No. 06-975
                                              :
HOWROYD-WRIGHT EMPLOYMENT AGENCY, :
INC., CINGULAR WIRELESS, LLC, NEW             :
CINGULAR WIRELESS, PCS, LLC, CINGULAR         :
WIRELESS EMPLOYEE SERVICES, LLC, and          :
JOSEPH RUIZ,                                  :
                                              :
              Defendants.                     :
_____      :

**MEMORANDUM**

**ROBERT F. KELLY, Sr. J.**                              **JANUARY 8, 2008**

       This is a sexual harassment employment discrimination action brought by Amy Kraus

("Kraus") against her former employer, Defendants Cingular Wireless, LLC, New Cingular

Wireless, PCS, LLC, and Cingular Wireless Employee Services, LLC (collectively "Cingular"),

and one of Cingular's former managers, Defendant Joseph Ruiz ("Ruiz").  Presently before this

Court are the Motions for Summary Judgment filed by Cingular and Ruiz, and for the following

reasons, the Motions will be granted.

**I.       BACKGROUND**

       Kraus graduated from the Pennsylvania State University in May, 2004, and, like many

college graduates, sought temporary employment in order to make money quickly.  She contacted

the Howroyd-Wright Employment Agency ("Apple One") to help her with this endeavor.  In

June 2004, Apple One arranged for Kraus to interview with Cingular as that company had an

immediate need for an administrative assistant for six months. Kraus interviewed with Cingular, was offered the job, and began working at the Bensalem office on June 10, 2004.

Kraus performed administrative functions for Cingular's engineering group, of which Ruiz was a manager, and was supervised by Ruiz and another person. However, Ruiz assigned the majority of the work Kraus performed, and supervised her a majority of the time. Beginning in October, 2004, Ruiz began making suggestive comments to Kraus, indicating to her that he was sexually interested in her. She stated that initially the comments were innocent, but Ruiz intensified his pursuit of her over the next two months. Kraus left her job on December 3, 2004, after she told Apple One that she could not endure Ruiz's conduct any longer. Ruiz's conduct forms the basis of her action.

The sexually suggestive conduct Kraus complains of began in October, 2004. The initial incident involved Ruiz telling Kraus about a sexual dream he had about her. He mentioned his dream while the two of them were in the office break room during their morning break. Ruiz just briefly discussed the dream in the break room, after which he and Kraus returned to their desks. Once at his desk, Ruiz initiated an online conversation with Kraus via America Online's Instant Messenger ("IM"), an online communication tool analogous to real-time email, and he and Kraus discussed his dream in detail.

The IM is reprinted below in an unaltered state. Amk257 is Kraus's screen name, and jruizFSA2 denotes statements made by Ruiz. The text reads as follows:

    jruizFSA:     so was that a weird dream or what
    Amk257:       hm
    Amk257:       yes
    Amk257:       but like i said
    Amk257:       still very funny

2

| | |
|---|---|
| Amk257: | it probably made more sense than any dream ive ever had |
| Amk257: | there was a story line and everything |
| jruizFSA2: | Yeah but I still have some questions in my mind |
| Amk257: | about what |
| jruizFSA2: | Um...that I should probably keep to myself...maybe crossing a line on that one |
| jruizFSA2: | ya know what i mean....? |
| Amk257: | did you opt out of sharing part of the dream with me or something |
| Amk257: | is this like a, why was i in it in the first place kinda question |
| jruizFSA2: | the first one you mentioned |
| jruizFSA2: | i made the dream more PG if you know what i mean |
| jruizFSA2: | less R |
| Amk257: | hahahaha |
| Amk257: | it happens |
| jruizFSA2: | yes.....i mean it wasn't totally R...maybe PG-13 |
| Amk257: | haha. Well that isnt so bad then |
| Amk257: | at least its no NC-17, ya know? |
| Amk257: | then thered REALLY be questions |
| jruizFSA2: | i am lying...just back peadling |
| Amk257: | haha |
| jruizFSA2: | so I am not telling you unless you twist my arm |
| Amk257: | yea, peoples minds do weird things when theyre sleeping.  It doesnt mean much |
| Amk257: | should i twist it then?  I cant help but be curious now that you made a big stink about it |
| jruizFSA2: | the twisting is up to you.... |
| jruizFSA2: | the amount of twisting |
| Amk257: | im curious what the questions are |
| jruizFSA2: | the ones i have ....you mean? |
| Amk257: | right |
| Amk257: | if im in it, don't you suppose i have a right to know? |
| jruizFSA2: | i was wondering why you were just in your panties in my dream... |
| Amk257: | well yea, thatd be the obvious question |
| Amk257: | i couldve figured that out |
| jruizFSA2: | and y would you think |
| Amk257: | well, thats one of my own questions |
| Amk257: | i don't know the answer to that |
| Amk257: | so was it more R cause there was more nakedness or something? |
| jruizFSA2: | kind of |
| jruizFSA2: | but more twisting will only get that info |
| Amk257: | ok ok, im twisting |
| jruizFSA2: | hold on |
| jruizFSA2: | please |

| | |
|---|---|
| jruizFSA2: | so what do you want to know |
| Amk257: | what im missing |
| jruizFSA2: | well you seem in distress in the dream.. |
| jruizFSA2: | and needed my help... |
| Amk257: | because i stole the clothes, or because im half naked? |
| jruizFSA2: | both... |
| Amk257: | got it |
| Amk257: | im with ya so far |
| jruizFSA2: | are you interested in any more details? |
| Amk257: | well yea, that didnt clear anything up |
| jruizFSA2: | well....depends on how much you want to know |
| Amk257: | you might as well tell me it al |
| jruizFSA2: | r u sure.... |
| jruizFSA2: | may get a bit graphic |
| Amk257: | im sure its nothing i havent seen or heard before |
| Amk257: | i can handle graphic |
| jruizFSA2: | can i ask y you r interested? |
| Amk257: | sure.  Because Im a highly inquisitive person |
| Amk257: | and i hate not knowing things |
| jruizFSA2: | well to say the least..i took advantage of you being half naked |
| Amk257: | ok |
| jruizFSA2: | do you want details? |
| Amk257: | if you don't care about telling me |
| Amk257: | im not trying to make you uncomfortable |
| jruizFSA2: | well we made use of the table in my office....... |
| jruizFSA2: | and you fought at first...then you submitted |
| Amk257: | uh huh |
| jruizFSA2: | would you like to know exactly what we did on that table? |
| Amk257: | shoot |
| jruizFSA2: | well your panties were off...and I thing I took them off with my mouth... |
| jruizFSA2: | by the way...this is between you and i right? |
| jruizFSA2: | speechless? |
| Amk257: | of course |
| Amk257: | a little |
| jruizFSA2: | you wanted to know...... |
| Amk257: | I know |
| jruizFSA2: | are you now wishing you did not? |
| Amk257: | nah |
| jruizFSA2: | so what are you thinking |
| Amk257: | i did tell you i wanted to know |
| Amk257: | I don't know....and here i originally thought you just killed me or something |

4

| | |
|---|---|
| jruizFSA2: | ha |
| Amk257: | but i can see where that question arises |
| jruizFSA2: | nope, shoudl have told you that it was more sexual in nature |
| Amk257: | I assumed |
| Amk257: | i just meant my original reaction when you mentioned it a few days ago |
| jruizFSA2: | oh.... |
| Amk257: | was that the only question you had? |
| jruizFSA2: | actually...i kind of understand the dream... |
| jruizFSA2: | why what happened, happened in the dream... |
| Amk257: | you understand it how |
| jruizFSA2: | why you were in the dream...and why you were in that state...and why we did what we did |
| jruizFSA2: | and i am sure you can figure out why |
| Amk257: | so iguess i shouldnt ask then, huh |
| jruizFSA2: | unless you really want to know |
| Amk257: | is that why you're telling me about it? |
| jruizFSA2: | no, i was gonna leave it until you asked for the details |
| Amk257: | oh |
| Amk257: | well yea...I always want details |
| jruizFSA2: | y in this case? |
| Amk257: | im not entirely sure |
| jruizFSA2: | do you know what i am getting at? |
| Amk257: | again, im not entirely sure |
| jruizFSA2: | ok, good.... |
| jruizFSA2: | what would your guess be? |
| Amk257: | that this all stemmed from my wearing inappropriate shirts |
| Amk257: | haha |
| Amk257: | or cause youd want it to happen |
| jruizFSA2: | .......no on number one...maybe on number two.... |
| jruizFSA2: | now that you know that.....what r u thinking? |
| Amk257: | well its more wondering |
| jruizFSA2: | like what? |
| Amk257: | like, why me |
| jruizFSA2: | r u kidding..... |
| Amk257: | not at all |
| jruizFSA2: | do you not think that you are attractive? |
| Amk257: | well, yea I mean i think im alright |
| jruizFSA2: | i am sure most would say better than all right... |
| Amk257: | i don't know if this is going to come across wrong...but have you said anything like this to anyone before me? |
| Amk257: | and thank you |
| Amk257: | thats a big compliment |

5

(Pl.'s Resp. Opp'n Cingular's Mot. Summ. J., Ex. 8.)  The conversation continued with Ruiz telling Kraus that he found her very attractive, and Kraus responding that she was "beyond flattered" by his compliments.  A break in the dialogue occurred when Ruiz went to lunch.

After returning from lunch, Ruiz resumed the conversation by asking Kraus via IM if she wanted to know anything else.

| | |
|---|---|
| jruizFSA2: | so you don't want to know anything else? |
| Amk257: | well I was expecting to be questioned.  I hadnt really thought up questions myself |
| Amk257: | what else should i know? |
| jruizFSA2: | just wanted to knwo what you thought about my dream and conversation? |
| Amk257: | well...it was totally flattering and um, i dunno kinda hot and surprising all at the same time |
| Amk257: | but at the same time, your still very much my boss. |
| jruizFSA2: | hot is what way? |
| Amk257: | i guess in the, i can see where you're coming from, way..if that makes sense |
| jruizFSA2: | no. u lost me? |
| Amk257: | ok. |
| Amk257: | hmm |
| jruizFSA2: | what do you mean exactly....did you like the story line? |
| Amk257: | well yea it was a good story |
| Amk257: | and i can empathize with your fidgetyness to some degree |
| jruizFSA2: | now everytime you knock on my door i will wonder if you have pants on! |
| Amk257: | haha |
| jruizFSA2: | and if you don't i will know what you want...... |
| Amk257: | well chances are, i will..unless it's a skirt |
| Amk257: | yea.  Might freak out the rest of the office though, huh? |
| Amk257: | haha |
| jruizFSA2: | well.... you could come in with them on then take them off... |
| jruizFSA2: | ... |
| Amk257: | true |
| jruizFSA2: | i shouldnt hold my breath...though? |
| Amk257: | but like i said...Your're still my boss.  At least for another month or whatever |
| jruizFSA2: | what do you mean ...when you say...you are still my boss? |
| Amk257: | i mean until December, you're my boss |

| | |
|---|---|
| jruizFSA2: | i know....ao when I am not your boss you will feel differently? |
| Amk257: | well the other thing that throws me tho is..you know i like you and respect you a lot as a person...and you've got a whole life that im not trying to ruin |
| jruizFSA2: | did u ever think about it? answer honestly |
| Amk257: | it might have crossed my mind |
| jruizFSA2: | really...now i am flattered... |
| Amk257: | well thats good |
| Amk257: | you should be. |
| Amk257: | but i attempt to maintain some form of professionalism..as best i can at least |
| jruizFSA2: | so what were you thinking ...when you did think somethign? |
| Amk257: | honestly it was just a brief what-if kinda thought |
| jruizFSA2: | you have a better imagination then that |
| Amk257: | maybe... |
| jruizFSA2: | oh..i can tell you are artistic |
| Amk257: | yea, it amazes me that you can tell that at all |
| Amk257: | apparently im oblivious to a lot, b/c i didnt think i came across like that either |
| jruizFSA2: | i am very perceptive |
| Amk257: | i see that |
| jruizFSA2: | so...no more details on your fleeting notion |
| Amk257: | no...nothing that wouldnt get me in trouble |
| jruizFSA2: | come on...i am already in trouble...and we are both adults |
| jruizFSA2: | please.... |
| Amk257: | similar to yours though.. |
| jruizFSA2: | give me an idea |
| jruizFSA2: | some details |
| Amk257: | ok...think your dream, but subtract the whole damsel in distress thing.  And of coruse i don't show up half dressed. |
| jruizFSA2: | so you come to my office...?  i guess no one is around.....and who makes the first move? |
| Amk257: | i dunno..i generally just skip ahead |
| jruizFSA2: | to what? |
| Amk257: | the hook up part |
| jruizFSA2: | ah...anywhere specific....in my office? |
| Amk257: | not really |
| jruizFSA2: | who is taking the lead....u or me? |
| Amk257: | me |
| jruizFSA2: | nice...is that how you usually are? |
| jruizFSA2: | take control... |
| Amk257: | sometimes |
| Amk257: | it depends on my mood |

> jruizFSA2:    you look like you would take control.....
> Amk257:       well then you are perceptive

(Pl.'s Resp. Opp'n Cingular's Mot. Summ. J., Ex. 8.)  As the conversation proceeded, Ruiz and

Kraus discussed whether either of them would like to initiate a relationship.  To that end, Ruiz

asked Kraus to rate her desire to act on her feelings.

> jruizFSA2:    so on a scale of 1-10 (10 being really want it to happen) what
>               would you rate your feelings....
> jruizFSA2:    not factoring in anything else...
> Amk257:       so not factoring in whether or not it SHOULD, then?
> jruizFSA2:    right
> Amk257:       oh boy
> Amk257:       hm
> jruizFSA2:    be honest
> Amk257:       i dunno..see its hard for me to separate everything else
> jruizFSA2:    sure you can....
> Amk257:       let me think
> Amk257:       ill brb
> jruizFSA2:    k
> Amk257:       ok...um...6.5?

(Pl.'s Resp. Opp'n Cingular's Mot. Summ. J., Ex. 8.)  Ruiz was displeased that Kraus's desire to

act on her feelings rated so low, so he asked her again.  Kraus replied the second time that her

desire was more like 7.5-8 out of ten, and with that their conversation about Ruiz's dream

concluded.

Kraus testified that in the weeks following the dream discussion, Ruiz began verbally

harassing her almost daily, and she has provided specific examples of the sexual comments Ruiz

made.  On one occasion, Ruiz told Kraus that he wanted to see her naked, and that he wanted to

kiss her.  He twice told her about his desire to bend her over his desk, and one time he asked her

to have oral sex with him.  There was also an instance where Ruiz, while on a business trip,

called Kraus at home, and told her that he wished she was with him so they could have sex in the

shower.  Kraus also stated that Ruiz implied that if she had sex with him, he could help her find a

permanent position.

On November 5, 2004, about a month after the dream conversation with Ruiz, Kraus

talked with a friend via IM about whether she should engage in a relationship with Ruiz.  That

IM reads as follows:

| | |
|---|---|
| Koveypants: | well |
| Koveypants: | i mean we both know that its bad to do it |
| Koveypants: | cause of steve, the wife, the kids, and the job |
| Koveypants: | right.....so its bad |
| Koveypants: | ........but u still wanna do it |
| Amk257: | well yea, sorta, but now im freaked out |
| Amk257: | and fear it wont be enjoyable |
| Koveypants: | i know it will be enjoyable and an exciting experience |
| Koveypants: | .....a story to tell generations to come |
| Koveypants: | hahahhahhaha |
| Koveypants: | i mean its real scary.....but thats what makes it super kinky |
| Amk257: | right |
| Amk257: | I have to go to church... |
| Koveypants: | hahahhaa no |
| Koveypants: | that wont make u feel better about it |
| Amk257: | i know |
| Amk257: | maybe itll convince me otherwise |
| Koveypants: | or maybe it will make u wanna do it more |
| Amk257: | well maybe |
| Amk257: | but if thats the case |
| Amk257: | then at least it was gods will |
| Koveypants: | hahahahhahha |

(Cingular's Mot. Summ. J., Ex. M.)  After a brief change of topic, the conversation returned to

the topic of whether Kraus wanted a sexual relationship with Ruiz.

| | |
|---|---|
| Amk257: | i need another opinion...not that yours isnt good...buti have no one to tell |
| Koveypants: | ooooooooooooo |
| Koveypants: | who else u gonna tell? |
| Amk257: | theres only abby |
| Koveypants: | kelly? |

9

```
Amk257:       i don't know!
Amk257:       i was thinking about that
Amk257:       but shes my sister
Amk257:       and thats kinda gross
Koveypants:   well i dunno
Koveypants:   abby would be funny....shed tell u no though
Amk257:       i know
Amk257:       i don't know
Amk257:       theres no one!
Amk257:       except a priest
Amk257:       but i cant be like...but itd be so HOT
Amk257:       to him
Koveypants:   hahhaa no he wouldnt appreciate it
```

(Cingular's Mot. Summ. J., Ex. M.)

On November 14, 2004, Kraus's boyfriend, Steven Kane, found a text message on her phone from Ruiz, and questioned her about it.  After Kane found the message, Kraus contacted Ruiz via IM to discuss the situation.  The unaltered IM reads:

```
jruizFSA2:    i bother you because i like you...alot...havent you got that yet goof
              ball
Amk257:       well yea, I have
jruizFSA2:    then stop asking sill girl...
jruizFSA2:    maybe you can borrow my eyes...and see what i see
Amk257:       i didnt mean it that way
jruizFSA2:    i know
jruizFSA2:    just breaking you chops
jruizFSA2:    what about the hug...
jruizFSA2:    i liked that your hands ran across my back...
jruizFSA2:    tired of talking.already?
Amk257:       sorry
Amk257:       i was on the phone
jruizFSA2:    no problem..
jruizFSA2:    just reading some articles..
Amk257:       ok
Amk257:       yea
Amk257:       the hug
Amk257:       but it was just a hug
jruizFSA2:    but your arms and hands took a trip....no?
Amk257:       thats kinda how i hug
```

| | |
|---|---|
| jruizFSA2: | i wanted another but you already left for the night... |
| jruizFSA2: | :-P |
| Amk257: | ha |
| Amk257: | yea...that should probably be the last one anyways |
| jruizFSA2: | really....was it getting your mind into trouble? |
| Amk257: | no |
| Amk257: | i just think it should be alook but don't touch thing, ya know? |
| jruizFSA2: | then y no more? |
| jruizFSA2: | nah...that wouldnt be fun...or bad:-) |
| Amk257: | no it wouldnt |

(Pl.'s Resp. Opp'n Cingular's Mot. Summ. J., Ex. 8.)  Kraus then told Ruiz that she no longer

wanted to pursue him.  She said that because her boyfriend found out about their conversations,

she was forced to pick one of them, and she did not want to do anything that could get her in

trouble with Kane.  Ruiz responded by telling her he felt like he had been strung along.  Kraus

then said:

| | |
|---|---|
| Amk257: | i cant and I don't want to |
| jruizFSA2: | wow |
| jruizFSA2: | that is the first time that you said that... |
| Amk257: | what, that i didnt want to |
| jruizFSA2: | yes |
| Amk257: | well, yea I dont want to get in trouble with anyone |
| jruizFSA2: | up to this point it seemed possible |
| jruizFSA2: | answer me this |
| Amk257: | hm |
| jruizFSA2: | is it that you don't want to ....or you dont want to get in trouble....which are 2 things.. |
| Amk257: | its like this |
| Amk257: | my boyfriend happen to hear/find a few of the messages you texted/left on my phone |
| Amk257: | so now.....im in some shit.....and Im swearing up and down that i wont fuck around |
| jruizFSA2: | when did this happen? |
| jruizFSA2: | today? |
| Amk257: | yesterday...but its continuing |
| Amk257: | hence my long ass phone call |
| Amk257: | getting yelled at |
| jruizFSA2: | why didn you tell me today... |

| | |
|---|---|
| Amk257: | i was trying not to have to |
| Amk257: | but since it doesnt seem like i can get around that fact |
| Amk257: | im telling you |
| jruizFSA2: | and what did i text you...dont remember anything |
| jruizFSA2: | most have been voicemails |
| Amk257: | there was at text about the dream or something |
| Amk257: | i dont really remember |
| Amk257: | but yea |
| jruizFSA2: | ? |
| Amk257: | so..yea.  Now i don't want anything because I don't want to be caught lying when i say im not going to do anything.  Ive always been honest with him m not about to become a liar. |
| Amk257: | and i feel like the queen of all bitches right now |
| Amk257: | but its just too important to me |
| jruizFSA2: | and you are coming across that way as well |
| Amk257: | im very sorry |
| Amk257: | well i thought so...and then i realized i didnt so much and that when i retreated-after I rethought things |
| Amk257: | im just trying hard not to hurt anyone...and it seems im hurting everyone in the process |
| jruizFSA2: | dont even know what to say |
| Amk257: | me either |
| Amk257: | i am sorry...im not even making any sense |
| Amk257: | Im gonna go now.. |
| jruizFSA2: | dont |
| Amk257: | why |
| Amk257: | i must have just confused the shit out of you |
| jruizFSA2: | dont want you to |
| jruizFSA2: | yea... |
| Amk257: | i really do apologize |
| jruizFSA2: | not sure i want to accept that....right now |
| Amk257: | i had to do what was right for me and this time, being bad isnt it, it seems.  Im sorry if i strung you along...if I did, I had no idea I was doing it |
| Amk257: | i understand |
| jruizFSA2: | i didnt think this conversation was going to put me in a foul fucking mood......boy was i wrong |
| Amk257: | i didnt think so at first either. |
| Amk257: | how mad are you |
| jruizFSA2: | very, very fucking mad |
| jruizFSA2: | does that explain it |
| Amk257: | yea |
| Amk257: | why.. |

| | |
|---|---|
| Amk257: | cause you think i strung you along |
| jruizFSA2: | bingo..... |
| jruizFSA2: | you win a cigar |
| Amk257: | hmm..and here i thought i was losing everything |
| jruizFSA2: | not in a joking mood...so u wont get any laughs from hert |
| jruizFSA2: | here |
| Amk257: | i know |
| Amk257: | i wasnt trying to string anything.  I meant what I said when I said it...and I told you, i rethought things |
| Amk257: | I meant that too |
| Amk257: | I know that i didnt say i didnt want anything |
| jruizFSA2: | yea...i know...but you went along for that ride...and i didnt |
| Amk257: | thats a hard thing for me to say. And honestly, i didnt know what I wanted, so i would be lying if i had said that.  But I know I don't want to hurt people i really care about (which includes you), which is why its better for me and you and everyone to end it as much as possible now before you get really attached or something |
| jruizFSA2: | what is wrong with getting attached....dont you think that i would take care of you. |
| jruizFSA2: | as much as possible |
| Amk257: | What can come from you getting attached?  I think youd try to take care...but i dont think you can the way id need to be.  We couldnt have a real relationship and you know that |

(Pl.'s Resp. Opp'n Cingular's Mot. Summ. J., Ex. 8.)  Ruiz, upset by this turn of events, then

asked why Kraus had gone along for the ride in the first place.  Kraus responded by telling him

that she liked his attention, and ended by saying at the time she was not technically with her

boyfriend and had a loophole to talk to other people.

The next day, November 15, 2004, Kraus and Kane engaged in an IM discussion where

she told Kane about her conversation with Ruiz the night before.  The IM reads:

| | |
|---|---|
| fast94m: | what did you say to him? |
| Amk257: | i said things need to be look but don't touch, i said my bf knows what going on...i said i dont want to get in trouble with anyone, that i dont want to do anything that would hurt hium.  I cant and i don't want to |
| Amk257: | and he said, thats the first time you flat out said i don't want to |
| Amk257: | and i said ya |

(Cingular's Mot. Summ. J., Ex. O.)  Kane focused on Kraus's failure to inform Ruiz prior to that

exchange that she did not desire a sexual relationship with him.  Kane then added:

| | |
|---|---|
| fast94m: | and now do you realize how YOU can string ppl along sometimes? Cause i think this isn't the first person you've done this too, though hes def not left off the hook for multiple reasons cause of it |
| fast94m: | you both failed |
| fast94m: | but you both get it it seems |
| fast94m: | so better late then nevef |
| fast94m: | and if he thinks youre a bith, its just to save his own pride for getting let down by THE MOST BEAUTIFUL THING TO EVER TOUCH THIS FUCKING EARTH |
| fast94m: | so there |
| fast94m: | i have a headache |
| fast94m: | eagles better not lose, too much stress for one say to begin with, thank god i don't own a gun |
| fast94m: | bye |
| Amk257: | ......:'( |
| Amk257: | yea. I lose |
| fast94m: | how do you lose? |
| Amk257: | because I FUCKING LOS |
| Amk257: | lose* |
| Amk257: | I lose it all |
| Amk257: | i have nothing |
| Amk257: | i feel like shit |
| Amk257: | i wanna go die |
| Amk257: | thank you and good night |
| fast94m: | you have your pride and self respect back |
| fast94m: | you no longer take shit |
| fast94m: | and have shown it |
| fast94m: | and shown me how much you care |
| fast94m: | both of which are good things |
| Amk257: | i DO CARE |
| Amk257: | I care so FUCKING MUCH |
| fast94m: | i know |
| Amk257: | and you make me do this to prove it |
| fast94m: | you just showed it |

(Cingular's Mot. Summ. J., Ex. O.)  Kraus concluded by stating that she felt bad for acting the

way she did with Ruiz, but Kane assured her it was the right thing for her to do.

On November 16, 2004, Ruiz and Kraus had a conversation about her decision to end

what had been developing between them.  The IM reads:

| | |
|---|---|
| Amk257: | no.  I dont care that you're telling me you dont want to talk about this anymore |
| Amk257: | but youre acting like someone who didnt get their way and now theyre gonna be pouty |
| Amk257: | i didnt promise you anything |
| jruizFSA2: | no, i am acting like someone who is feeling a bit fucked over and I ma fucking pissed..... |
| jruizFSA2: | you would too.... |
| Amk257: | i didnt fuck you over |
| jruizFSA2: | ok, how about led me to believe... |
| jruizFSA2: | is that easier to swallow? |
| Amk257: | i tried to correct that many times, and if youd think back, youd see it |
| jruizFSA2: | yes, but even as of yesterday you were still not telling me....that came out last night...especially since I asked point blank....and you still waffeled |
| Amk257: | i was certainly telling you we shouldnt and you shouldnt |
| jruizFSA2: | but i was asking you if you wantedme to stop...and you never said yes |
| Amk257: | i didnt realize that wasnt strong enough to understand |
| jruizFSA2: | well when i asked 3-4 times...i figured you got the hint |
| Amk257: | i had a hard time answering.  Ill take responsibility for that |

(Pl.'s Resp. Opp'n Cingular's Mot. Summ. J., Ex. 8.)  Ruiz also told Kraus he hated her, but

assured her that the feeling would eventually pass.

The final event that Kraus complains of occurred on Friday, December 3, 2004.  Ruiz

called Kraus into his office to discuss work-related matters.  The meeting began professionally,

but quickly devolved into a sexually charged situation.  Kraus testified that Ruiz made faces at

her, raised his eyebrows, told her that he wanted to kiss her and smell her hair, asked her to sit on

his lap, and licked his lips in a provocative manner.  In response, Kraus told Ruiz again that she

was not interested.  When she got up to return to her desk, Ruiz rose as well and tried to hug her,

15

and Kraus pushed him away.  He persisted, and grabbed her arms to pull her closer to him.  She

pushed him away again and then exited his office.  During this episode, Ruiz was standing in

front of the doorway, which forced Kraus to shuffle around him to get through the open door.

After she left Ruiz's office, she returned to her desk and finished out the day.

On the following Monday, December 6, 2004, Kraus called Apple One while driving to

work and spoke with Steve Tompkins, an Apple One representative.  She told Tompkins that she

did not want to go to her job because Ruiz's conduct made her uncomfortable.  Tompkins told

her to go home, and he said he would call her out sick for that day.  He also asked her to come to

the office to fill out a sexual harassment complaint form.  Kraus went to Apple One's office on

December 8, 2004, and completed the form.  Apple One faxed the complaint to Cingular, who

conducted an investigation.  Ruiz was not subjected to disciplinary action.

Kraus did not return to Cingular for the remaining weeks of her sixth month assignment.

On December 14, 2004, Ruiz contacted her via IM and asked her why she had not come back to

work.  She told him that he had made her uncomfortable.  Ruiz offered an apology, and again

asked why she had gone along for the ride in the first place.  Kraus responded that she was just

trying to be nice, and she thought it would be cool to talk about the dream.  Ruiz offered her his

apology again, and told her that he knew of some job openings at Cingular.  He offered to put in

a good word for her, which she accepted.  This was the last IM conversation they had.

Kraus filed a charge with the Equal Employment Opportunity Commission and the

Pennsylvania Human Relations Commission on May 3, 2005.  She was thereafter issued a right

to sue letter, and on March 3, 2006, she filed a Complaint in this Court.  On July 7, 2006, Kraus

filed an Amended Complaint against Defendants Cingular, Ruiz, and Apple One.  On September

16

20, 2007, these three Defendants each filed a Motion for Summary Judgment on all counts.  On

October 31, 2007, Kraus voluntarily dismissed Apple One, and with that action disposed of

Count IV in its entirety.  Thus, only the Motions of Ruiz and Cingular are before this Court.

      Cingular and Ruiz seek summary judgment on all claims contained in the Amended

Complaint, which was stated in ten counts.  Counts I, II, III, and V state claims against Cingular

for violations of 42 U.S.C. § 2000e, et seq., 42 U.S.C. § 1981a, 43 P.S. § 951, and for negligent

failure to train.  Counts VI, VII, VIII, IX, and X raise claims against Cingular and Ruiz for

negligent infliction of emotional distress, intentional infliction of emotional distress, assault,

false imprisonment, and punitive damages.  Each count is discussed below.

## II.    STANDARD OF REVIEW

      Summary judgment is proper when "there is no genuine issue as to any material fact and

. . . the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Hines v.

Consol. Rail Corp., 926 F.2d 262, 267 (3d Cir. 1991).  A court must determine "whether the

evidence presents a sufficient disagreement to require submission to the jury or whether it is so

one-sided that one party must prevail as a matter of law."  Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 251-52 (1986).  In the absence of any material factual disputes, summary judgment

must be granted against "a party who fails to make a showing sufficient to establish the existence

of an element essential to that party's case, and on which that party will bear the burden of proof

at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

      This Court is required, "before the evidence is left to the jury," to determine "whether

there is any [evidence] upon which a jury could properly proceed to find a verdict for the party

producing it, upon whom the onus of proof is imposed."  Anderson, 477 U.S. at 251.  A "judge's

inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict[.]" Id. at 252.  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Id.  "[S]ummary judgment should be granted where the evidence is such that it would require a directed verdict for the moving party[.]" Id. at 251.

## III.   DISCUSSION

### A.   Count I—Sexual harassment

Title VII of the Civil Rights Act makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to [the] . . . terms, conditions, or privileges of employment, because of such individual's . . . sex[.]" 42 U.S.C. § 2000e-2(a)(1).  It is well settled that sexual harassment is a form of sex discrimination prohibited by the statute. Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 66 (1986).  Sexual harassment can take the form of a hostile work environment or quid pro quo harassment, and Kraus alleges both types in Count I of her Amended Complaint.

#### 1.   Hostile work environment

A hostile work environment exists when the workplace is "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment[.]" Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (internal quotes omitted).  In order to prove her a hostile work environment claim, Kraus must show five things: (1) that she suffered intentional discrimination

18

because of her sex, (2) the discrimination was severe or pervasive,[1] (3) it detrimentally affected her, (4) it would have detrimentally affected a reasonable person in like circumstances, and (5) there is a basis for employer liability.  Andreoli v. Gates, 482 F.3d 641, 643 (3d Cir. 2007) (citing Weston v. Comm'w of Pa., 251 F.3d 420, 426 (3d Cir. 2001)).  Cingular believes that Kraus cannot establish that the alleged discrimination was severe or pervasive.  Therefore, this Court will focus its analysis on the second element of the test.[2]

"Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview."  Harris, 510 U.S. at 21.  The lower courts have been given the task of determining whether working environments are sufficiently hostile or abusive to incur Title VII liability.  Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998).  The Supreme Court has "directed courts to determine whether an environment is sufficiently hostile or abusive by 'looking at all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  Id.

"A recurring point in [the Supreme Court's decisions] is that simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory

_____

[1] The Third Circuit frequently uses the phrase "pervasive and regular" when discussing this element of the test.  See e.g. Andrews v. City of Phila., 895 F.2d 1469, 1482 (3d Cir. 1990).  However, as the Third Circuit has noted, the Supreme Court's formulation is "severe or pervasive," and the use of those words is important.  Jensen v. Potter, 435 F.3d 444, 449 n. 3 (3d Cir. 2006) (abrogated in part on other grounds by Burlington N. & Sante Fe Ry. Co. v. White, 126 S. Ct. 2405 (2006)).  As the Supreme Court's standard is "severe or pervasive," that formulation will be applied in this case.

[2] While the parties have briefed extensively on the question of whether the defenses promulgated in Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998) and Faragher v. City of Boca Raton, 524 U.S. 775 (1998) apply in this case, this issue need not be addressed here as Kraus cannot establish the second element of the test.

changes in the terms and conditions of employment." Id. at 788. Pervasiveness is not shown

without conduct that is "more that episodic; [it] must be sufficiently continuous and concerted in

order to be deemed pervasive." Id. at 787 n. 1. Most importantly, Title VII does not impose a

general civility code on the workplace, and the standards for judging hostility are intentionally

demanding so that complaints attacking the ordinary tribulations of the workplace are filtered

out. Id. at 788. Courts and juries must ensure that they "do not mistake ordinary socializing in

the workplace—such as male-on-male horseplay or intersexual flirtation—for discriminatory

conditions of employment." Oncale v. Sundowner Offshore Serv., Inc., 523 U.S. 75, 81 (1998).

       The first step in this analysis is to identify what harassment a reasonable jury could link to

a discriminatory animus. See Jensen v. Potter, 435 F.3d 444, 449-450 (3d Cir. 2006) (abrogated

in part on other grounds by Burlington N. & Sante Fe Ry. Co. v. White, 126 S. Ct. 2405 (2006)).

Kraus has identified five incidents as discriminatory. The first is the discussion she and Ruiz had

concerning his sexual dream about her. The second incident involves comments Ruiz made to

her "about the shower and him wanting to see me naked, comments about kissing . . . about

wanting to bend me over a desk[,]" and talking about engaging in oral sex. (Kraus Dep. at 116-

17.) Third, Ruiz called her once and told her he wished she was with him so they could have sex

in the shower. (Kraus Dep. at 118.) The fourth incident was Ruiz's offers to help her find a

permanent position at Cingular in exchange for sexual favors. (Kraus Dep. at 183-84.) Kraus

claims that the final harassing incident action was Ruiz's conduct in attempting to hug her during

their December 3, 2004, meeting in his office. (Kraus Dep. at 91-95.)

       Kraus has not presented evidence showing that she was subjected to an objectively hostile

environment. Regarding the first incident, the text of the IM conversations clearly shows that

20

Kraus and Ruiz engaged in intersexual flirtation in the office.  Kraus willingly discussed the sex dream with Ruiz, and even encouraged him to provide her with details.  She also engaged in her own sexual banter by telling Ruiz that she had sexual thoughts about him.  Kraus testified at her deposition that she even flirted with Ruiz, and defined flirting to mean that she made statements to Ruiz indicating "some expression of liking."  (Kraus Dep. at 273.)  She qualified the testimony by saying that while she made flirtatious statements, they did not include "actual liking," and she believes that Ruiz should have interpreted her flirtations only complimentary.  (Id.)  A reasonable person, viewing the totality of the situation, could not find that the IM conversation between Ruiz and Kraus constituted anything other than intersexual flirtation, which the Supreme Court has stated should not be mistaken with discriminatory conditions of employment.  See Oncale, 523 U.S. at 81.  Ruiz's conduct may be abhorrent given his marital status, but that fact does not make his action the equivalent of actionable sexual harassment.

In regard to the other events, even assuming that they constitute harassment, they are at best sporadic and isolated incidents, and none are sufficiently severe to rise to the level of a hostile work environment.  See Saidu-Kamara v. Parkway Corp., 155 F. Supp. 2d 436, 439-40 (E.D. Pa. 2001) (holding that touching plaintiff's breasts and buttocks, sexual comments, and offer of financial help in return for sex did not create hostile environment); McGraw v. Wyeth-Ayerst Lab., Inc., No. 96-5780, 1997 U.S. Dist LEXIS 20813, at * 17 (E.D. Pa. Dec. 30, 1997) (held that kissing plaintiff and touching her face not severe).  Courts have consistently held that "[o]ccasional insults, teasing, or episodic instances of ridicule are not enough; they do not permeate the workplace and change the very nature of the plaintiff's employment."  Jensen, 435 F.3d at 451.  Sexually charged comments, one sexually explicit phone call, banter about helping

21

Kraus find a permanent job in exchange for sex, and an attempt to hug her do not show that the workplace was permeated with insults and discriminatory actions.  Moreover, the totality of the circumstances shows that Kraus and Ruiz did engage in a sexually flirtatious professional relationship.  Kraus cannot establish severe or pervasive harassment, and therefore summary judgment must be granted in Cingular's favor on Count I insofar as it alleges a hostile work environment.

       **2.       Constructive discharge**

Kraus also alleges in Count I that she was constructively discharged.  This claim must fail because to establish a constructive discharge, a plaintiff must make a further showing than the one required to prove a hostile working environment claim.  Pa. State Police v. Suders, 542 U.S. 129, 134 (2004).  Since she cannot establish a hostile work environment, she is precluded from establishing a constructive discharge claim.  Failure to establish a hostile work environment is fatal to a constructive discharge claim.  Konstantopoulus v. Westvaco Corp., 112 F.3d 710, 718-19 (3d Cir. 1997).  Thus, Cingular is granted summary judgment on Count I to the extent that the claim alleges constructive discharge.

       **3.       Quid pro quo**

Kraus also alleges quid pro quo harassment in Count I.  This type of sex discrimination occurs when an employer demands that an employee provide sexual favors to gain employment benefits or avoid adverse action.  Barbara T. Lindemann & Paul Grossman, Employment Discrimination Law 1306 (C. Geoffrey Weirich ed., 4th ed. 2007).  Advances or requests for sexual favors constitute sexual harassment when "(1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment [or] (2) submission to

or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual . . .."  Robinson v. City of Pittsburgh, 120 F.3d 1286, 1296 (3d Cir. 1997) (abrogated in part on other grounds by Burlington N. & Sante Fe Ry. Co. v. White, 126 S. Ct. 2405 (2006)).  To establish a quid pro quo harassment claim, Kraus "must demonstrate either that she submitted to the sexual advances of her alleged harasser or suffered a tangible employment action as a result of her refusal to submit to those sexual advances[.]" Hurley v. Atl. City Police Dept., 174 F.3d 95, 133 (3d Cir. 1999).

   It is undisputed that Kraus and Ruiz did not have a sexual relationship, and Kraus was not offered a permanent position at Cingular.  (Joint Statement of Undisputed Facts, ¶ 27; Pl.'s Resp. to Joint Statement ¶ 27.)  She therefore alleges that her rejection of Ruiz's advances was the basis for Cingular's decision not to consider her for a permanent job.  Kraus contends that Cingular failed to promote her, which is a tangible employment action.  Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998).  However, Kraus has not provided any evidence showing that Cingular failed to promote her to a permanent position.  Most importantly, she has not shown that her temporary position was at any time slated to become a permanent position at Cingular.

   Kraus testified that Ruiz said to her on more than one occasion that "[i]f you do this [meaning have a sexual relationship with him], then I will assist in getting you this permanent job thing." (Kraus Dep. at 162.)  In support of her claim, she provided the deposition testimony of Steven Tompkins, an Apple One representative.  Tompkins said that all temporary jobs can potentially become permanent if an employer chooses to make it permanent.  (Tompkins Dep. at 61.)  Kraus believes this statement establishes Cingular's failure to promote her to a permanent position.  However, Kraus omits that fact that when Tompkins was asked whether her temporary

job had the potential to become permanent, he said that it did not.  (Tompkins Dep. at 60.)  Thus, no evidence has been presented which shows that her position had long-term potential and she was not considered for it.  She cannot establish quid pro quo harassment, therefore summary judgment must be granted in favor of Cingular on Count I insofar as it alleges quid pro quo sexual harassment.

**B.**     **42 U.S.C. § 1981a claim**

In Count II of her Amended Complaint, Kraus alleges that Cingular violated 42 U.S.C. §1981a.  Section 1981a states: "[i]n an action . . . against a respondent who engaged in unlawful intentional discrimination . . . prohibited under . . . [42 U.S.C.A. §§ 2000e-2, 2000e-3, or 2000e-16] . . . the complaining party may recover compensatory and punitive damages . . . in addition to any relief authorized by section 706(g) of the Civil Rights Act of 1964, from the respondent."  42 U.S.C. § 1981a (a)(1).  "[T]he great weight of authority holds that § 1981a does not create an independent cause of action, but only serves to expand the field of remedies for plaintiffs in Title VII suits."  Pollard v. Wawa Food Mkt., 366 F. Supp. 2d 247, 251 (E.D. Pa. 2005).  Consequently, summary judgment must be granted in favor of Cingular on Count II as this claim cannot be stated as an independent cause of action.

**C.**     **Pennsylvania Human Relations Act claim**

In Count III, Kraus alleges that Cingular violated the PHRA, which makes it unlawful to discriminate against individuals because of their "race, color, religious creed, ancestry, age, sex, national origin or non-job related handicap or disability[.]"  43 Pa. Cons. Stat. § 955(a).  Federal courts treat the PHRA and Title VII as embodying identical standards, and the analyses under these statutes are co-extensive, and conduct that is unlawful under Title VII is similarly unlawful

24

under the PHRA.  Weston, 251 F.3d at 425 n. 3.  Summary judgment must therefore be granted in favor of Cingular on Count III as this Court granted summary judgment on Count I.

**D.      Failure to supervise claim**

In Count V, Kraus alleges that Cingular was negligent in supervising its employee.  The company argues that Kraus is barred from asserting this claim under the PHRA.  That act states: "as to acts declared unlawful by section five . . . the procedure herein provided shall, when invoked, be exclusive and the final determination therein shall exclude any other action, civil or criminal, based on the same grievance of the complainant concerned."  43 Pa. Cons. Stat. § 962(b).  Therefore, Kraus's negligent supervision claim is barred by the PHRA, see Murray v. Commercial Union Ins. Co., 782 F.2d 432, 437 (3d Cir. 1986), and summary judgment must be granted in favor of Cingular in regard to Count IV.

**E.      Negligent infliction of emotional distress claim**

In Count VI, Kraus alleges that she suffered severe emotional distress because of the negligent conduct of both Cingular and Ruiz.  The Defendants argue that Kraus's claims are barred under the Pennsylvania Workers' Compensation Act, which states that "[t]he PWCA provides the sole remedy for 'injuries allegedly sustained during the course of employment.'" Moyer v. Kaplan Higher Educ. Corp., 413 F. Supp. 2d 522, 529 (E.D. Pa. 2006) (citing 77 Pa. Stat. Ann § 481(a)).  The PWCA also states that, "[t]he liability of an employer under this act shall be exclusive and in place of any and all other liability to such employes . . . on account of any injury[.]"  77 Pa. Stat. Ann § 481(a).  Courts have consistently held that the exclusivity provision bars negligent infliction of emotional distress claims arising out of an employment relationship.  See Imboden v. Chowns Comm., 182 F. Supp. 2d 453, 456-57 (E.D. Pa. 2002)

25

(citing <u>Matczak v. Frankford Candy and Chocolate Co.</u>, 136 F.3d 933, 940 (3d Cir. 1997)).

Therefore, summary judgment must be granted in favor of Cingular and Ruiz[3] on Count VI.

**F.      Intentional infliction of emotional distress claim**

Kraus alleges in Count VII that she suffered emotional distress because of the intentional

sexual harassment perpetrated by Ruiz, and since he was acting in the course of his employment,

she names Cingular as a Defendant too.  Ruiz argues that Kraus cannot establish the outrageous

conduct necessary to support this claim, and Cingular raises a scope of employment defense.  For

Kraus to recover on her claim for intentional infliction of emotional distress, she must show that

Ruiz's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all

possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized

society."  <u>Imboden</u>, 182 F. Supp. 2d at 457.  "It is the court's responsibility to determine if the

conduct alleged in a cause of action reaches the requisite level of outrageousness."  <u>Andrews v.

City of Phila.</u>, 895 F.2d 1469, 1487 (3d Cir. 1990) (disagreement on other ground recognized by

<u>Jensen</u>, 435 F.3d at  449 n. 3).

"At the outset, it must be recognized that it is extremely rare to find conduct in the

employment context that will rise to the level of outrageousness necessary to provide a basis for

recovery for the tort of intentional infliction of emotional distress."  <u>Cox v. Keystone Carbon

Co.</u>, 861 F.2d 390, 395 (3d Cir. 1988).  "As a general rule, sexual harassment alone does not rise

---

[3]Ruiz asserts in his Motion for Summary Judgment that this Court lacks subject matter jurisdiction over him.  He alleges that because neither of the federal claims alleged in this action, Counts I and II, are applicable to him, this Court cannot assert supplemental jurisdictional over him regarding the state law claims contained in Counts V–X.  This Court finds no merit in his argument.  28 U.S.C. § 1367(a) says that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy[.]"  This Court has supplemental jurisdiction over the state law claims, and will exercise it accordingly.

to the level of outrageousness necessary to make out a claim for intentional infliction of emotional distress." Imboden, 182 F. Supp. 2d at 457. "Offensive comments and gestures in the workplace, even though sexually explicit, are not enough" to make out a claim. Id. A plaintiff must prove an extra factor, and "[t]he extra factor that is generally required is retaliation for turning down sexual advances." Andrews, 895 F.2d at 1487.

Kraus has not alleged that Ruiz or Cingular retaliated against her. Regardless, the evidence shows that Ruiz's conduct was nothing more than intersexual flirtation, which cannot be said to go beyond all possible bounds of decency. Kraus cannot establish outrageous conduct, and summary judgment must be granted in favor of Ruiz and Cingular on Count VII. This Court does not need to address the scope of employment defense raised by Cingular.

## G.    Assault claim

In Count VIII, Kraus alleges that Ruiz, acting in the scope of his employment, placed his hands on her body in an attempt to hug her, which caused her to suffer imminent apprehension of offensive bodily contact. The tort of assault is defined as "an intentional attempt by force to do any injury to the person of another[.]" Renk v. City of Pittsburgh, 641 A.2d 289, 293 (Pa. 1994). "In determining what actions constitute assaultive behavior, [Pennsylvania courts] ha[ve] followed a commonsense definition. It requires that the behavior, if it does not involve actual physical harm, must be such that it 'clearly evoke[s] a reasonable apprehension of bodily harm' in the person assaulted." Jackson v. Pa. Bd. of Prob. and Parole, 885 A.2d 598, 601 (Pa. Commw. Ct. 2005).

At her deposition, Kraus stated that: "[Ruiz] kept coming towards me like he was going to hug me. I didn't know if he was going to kiss me. How was I to think that wasn't going to

happen?  Did I think that he was going to hit me?  I have no idea." (Kraus Dep. at 192.)  Her testimony shows that she thought Ruiz might hug or kiss her.  Hugging and kissing do not involve physical harm, nor do they evoke a reasonable apprehension of bodily harm in people. Moreover, Kraus testified that she had hugged Ruiz before as a sign of friendship.  (Kraus Dep. at 104).  Pennsylvania courts have held that fear of bodily harm is a necessary element in finding that actions constitute assaultive behavior.  Kraus has not presented any evidence showing that she was in fear of bodily harm.  Thus, summary judgment must be granted in favor of Ruiz on Count VIII.  As Kraus cannot establish this claim, Cingular must also be granted summary judgment on Count VIII.

## H.     False imprisonment claim

Kraus alleges in Count IX that Ruiz, again acting in the scope of his employment, falsely imprisoned her in his office by standing in front of her and trying to hug her when she got up to leave his office.  Ruiz argues that Kraus cannot establish the prima facie elements, and Cingular again raises its scope of employment defense.  An actor is liable for false imprisonment if (a) he acts intending to confine the other within boundaries fixed by the actor, and (b) his act directly or indirectly results in such a confinement of the other, and (c) the other is conscious of the confinement or is harmed by it.  Krochalis v. Ins. Co. of. N. Am., 629 F. Supp. 1360, 1370 (E.D. Pa. 1985).  "The confinement within the boundaries fixed by the defendant must be complete; if there is a known, safe means of escape, involving only a slight inconvenience, there is no false imprisonment."  Id.  In this case, Kraus testified that:

> I got up to leave and he walked up in front of the door.  We were doing this, like shuffling thing, back and forth.  He wasn't letting me leave.  He tried to, you know, come in and hug me and I told him that I didn't want to hug him.

28

Eventually, I got out of the office[.]

(Kraus Dep. at 91.)  The fact that Kraus knew that she could exit through the door, and in fact did

exit by shuffling around Ruiz, precludes her from establishing a false imprisonment claim.  Since

the claim cannot be established, summary judgment must be granted in favor of Cingular and

Ruiz on Count IX.

**I.      Punitive damages claim**

In Count X, Kraus states a general claim against Cingular and Ruiz for punitive damages.

Whatever the merit of this contention, it is well settled that a request for punitive damages is not

a cause of action in and of itself.  Winterberg v. CNA Ins. Co., 868 F. Supp. 713, 725 n. 20 (E.D.

Pa. 1994).  Therefore, Count X will be dismissed as Kraus cannot bring a separate claim for

punitive damages.

An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____
                                    :

AMY KRAUS,                            :        CIVIL ACTION
                                        :

               Plaintiff,          :
                                        :

        v.                           :        No. 06-975
                                        :

HOWROYD-WRIGHT EMPLOYMENT AGENCY, :
INC., CINGULAR WIRELESS, LLC, NEW    :
CINGULAR WIRELESS, PCS, LLC, CINGULAR  :
WIRELESS EMPLOYEE SERVICES, LLC, and  :
JOSEPH RUIZ,                     :
                                        :

             Defendants.        :
_____  :

**ORDER**

        **AND NOW**, this  8th  day of January, 2008, upon consideration of Defendant

Cingular Wireless, LLC, New Cingular Wireless, PCS, LLC, Cingular Wireless Employee

Services, LLC's Motion for Summary Judgment (Doc. No. 34), Defendant Joseph Ruiz's Motion

for Summary Judgment (Doc. No. 36), and all responses and replies thereto, it is hereby

**ORDERED** that these Motions are **GRANTED**.

                                    BY THE COURT:


                                    /s/ Robert F. Kelly_____
                                    ROBERT F. KELLY
                                    SENIOR JUDGE